

Signed and Filed: November 13, 2013

**HANNAH L. BLUMENSTIEL**
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>JULIANA FLORES,<br><br>   Debtor. | Case No. 11-33156 HLB<br><br>Chapter 7 |
| In re:<br><br>PETER BELL,<br><br>   Debtor. | Case No. 11-33155 HLB<br><br>Chapter 7 |
| LAURENT LEGENDRE,<br><br>   Plaintiff,<br>v.<br><br>JULIANA FLORES, an individual; PETER BELL, an individual; RED & WHITE LLC, a California limited liability company; and DOES 1-10.<br><br>   Defendants. | Adv. Proc. No. 11-3220 HLB<br><br>(Substantively consolidated with Adv. Proc. No. 11-3221) |

### MEMORANDUM DECISION FOLLOWING TRIAL

These consolidated adversary proceedings came before the Court on October 1, 2013 for trial on the First Amended Complaint of Laurent Legendre ("Plaintiff"). Gregory C. Simonian appeared for Plaintiff. Chris Bell appeared for Juliana Flores and Peter Bell ("Defendants"). This memorandum decision constitutes the findings of fact and conclusions of

law required by Rule 52(a) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Plaintiff commenced these adversary proceedings for the purpose of obtaining a judgment declaring a debt Defendants owe to him nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).[1],[2] Based on the findings of fact and conclusions of law set forth below, the Court finds in favor of the Defendants on all counts.

In late 2009 or early 2010, Defendants formed Red & White LLC ("Red & White"), a California limited liability company, through which they operated a restaurant and wine bar known as Red & White. The restaurant struggled from the outset and after approximately one year, Defendants concluded that they needed to shut down or find a partner able to assist with a capital infusion and experience in running a restaurant.

Defendants were acquainted with Plaintiff because he owned and operated what they believed to be a successful restaurant located across the street from Red & White. Defendants approached Plaintiff and asked whether he would be interested in making an investment in Red & White in exchange for a stake in the business and significant control over its management and operation.

---

[1] Plaintiff also asserted claims for fraud, fraudulent concealment and false promises under California law. Given the Court's conclusions as to Plaintiff's claims under sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code, Plaintiff's state law claims are discharged and hereby dismissed.

[2] Unless otherwise indicated, all statutory citations shall refer to Title 11 of the United States Code aka the "Bankruptcy Code."

**MEMORANDUM DECISION FOLLOWING TRIAL**

Plaintiff and Defendants had several meetings during which they candidly discussed Red & White's financial situation, including the significant sums Defendants had borrowed or otherwise received from their respective families to keep their business afloat, pending litigation regarding a lease, and the fact that Red & White had fallen behind on payments to state taxing authorities. Defendants explained that Red & White was in a dire state and that, without a partner/investor such as Plaintiff, it would fail. Eventually, Plaintiff agreed to invest in Red & White.

On or about February 4, 2011, Defendants transmitted to Plaintiff a letter that summarized the terms of their agreement. The terms set forth in this letter were later incorporated into a Services and Subscription Agreement dated February 15, 2011 (the "SSA"). Defendants' attorney prepared both the February 4 letter and the SSA. Plaintiff neither consulted with counsel in connection with his investment in Red & White nor requested any revisions to the SSA.

The parties agreed that Red & White would close temporarily so that its décor and overall concept could be reworked in accordance with Plaintiff's vision. Plaintiff agreed to pay for any equipment and furnishings he chose to install. Plaintiff spent approximately $40,000 on remodeling.

Once the restaurant reopened, it would be known as Sel et Vin. Plaintiff was to create Sel et Vin's menu, establish relationships with vendors and oversee and train restaurant staff. As consideration for his provision of the foregoing

services, Plaintiff ultimately received a 49% non-voting membership interest in Red & White.

Plaintiff made several express representations in the SSA including, but not limited to, affirming that he had "such knowledge and experience in financial and business matters that [Plaintiff] is fully capable of evaluating the merits and risks of the transaction contemplated by the [SSA]." Plaintiff further represented that he had "to his own satisfaction and based on his own personal experience, sufficient understanding of the business, operations, financials and operating agreement for Red & White." Finally, Plaintiff and Defendants confirmed that "[a]part from the express warranties and representations of [the SSA], none of the parties makes any other warranty or representation, including, without limitation, any warranty or representation regarding the corporate standing, assets, liabilities, inventory, employees, rights, obligations, or contracts of Red & White."

Of particular relevance to this litigation are paragraphs 6 and 7 of the SSA. In paragraph 6, Plaintiff acknowledged his understanding that Red & White was approximately $150,000 in debt, which Defendants estimated to consist of approximately $100,000 of debt to Defendant Flores' relatives and approximately $50,000 of debt to vendors. Given that these amounts were estimates, the SSA obligated Defendants to provide Plaintiff with "accurate calculations of the debt" upon his request and where "reasonably possible." Defendants credibly testified that Plaintiff never requested any such information.

Paragraph 7 addressed distributions from post-reopening revenues. The parties agreed that Red & White's expenses would be paid from its gross revenues as follows:

    a. *Operating Expenses*. This includes rent, payroll, taxes and other government agencies, vendors, service providers, and other expenses associated with the regular operations of the business.

    b. *Equipment Leases*. Estimated at approximately $700/month.

    c. *Vendor debt payments*. Estimated at approximately $3,000 - $6,000/month, to be negotiated with vendors.

    d. *Start-up debt payments*. Estimated at approximately $2,000 - $4,000/month, to be negotiated with lenders.

    e. *Split between debt payments and cash reserve contributions*. Allocation will be two-thirds to debt, and one-third to cash reserve. Once the debt is fully paid, or once the cash reserve is at a level agreed as satisfactory by the parties, the parties will mutually agree on an appropriate allocation.

    f. *Salary to Laurent and Juliana*. Before August 15, 2011, as agreed by the parties. On or after August 15, 2011, as agreed by the parties, with reference to the time and efforts of the respective parties.[3]

Plaintiff testified that he understood paragraph 7 to require that Red & White's post-reopening revenues would be

---

[3] Plaintiff expressly agreed that, "under this arrangement, a significant monthly net profit must be achieved before [Plaintiff or Defendant Flores] begin to draw a salary."

used to pay Sel et Vin's expenses – not those of the original restaurant. Defendants, on the other hand, believed that the tax debts and other obligations owed to government agencies arising from Red & White's operations would be paid from Sel et Vin's revenues.

Defendants' understanding makes the most sense. When the parties entered into the SSA, they did not wind down Red & White and organize another entity through which to operate Sel et Vin. According to Defendant Flores' testimony, this meant that Red & White's licenses and other certifications, which it needed in order to continue to operate, would have been in jeopardy had it failed to repay the delinquent tax and other obligations it had accumulated prior to Plaintiff's investment. Accordingly, continuing to pay those debts out of Sel et Vin's revenues preserved the restaurant's ability to operate and renders Defendants' interpretation of paragraph 7 the most reasonable.

Unfortunately, Sel et Vin fared no better than Red & White and shut down for good in July 2011. Defendants filed petitions for relief under Chapter 7 of the Bankruptcy Code on August 28, 2011. Plaintiff commenced a nondischargeability action against each Defendant in December 2011. These actions were consolidated pursuant to a Stipulation approved in March 2012.

While Sel et Vin operated, Plaintiff paid approximately $9,400 in operating expenses the restaurant could not afford. After Sel et Vin closed permanently, Plaintiff spent approximately $15,000 paying certain post-shutdown expenses.

Plaintiff claims that these amounts, as well as the approximately $40,000 in remodeling costs he incurred, constitute nondischargeable debts.

Plaintiff asserts two causes of action against Defendants, pursuant to which he seeks a determination that the debt he claims Defendants owe to him is nondischargeable. Plaintiff first asks the Court to find this debt nondischargeable under section 523(a)(2)(A), which states, in relevant part:

> (a) A discharge . . . does not discharge an individual debtor from any debt –
>
> (2) for money, property, services . . . to the extent obtained by –
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In order to prevail, Plaintiff must prove all of the following by a preponderance of the evidence:

(1) The existence of a misrepresentation, fraudulent statement or omission by the Defendants;

(2) that the Defendants knew of the falsity or fraudulent nature of his or her statements or omissions or actions at the time they were made or taken;

(3) that the Defendants intended to deceive the Plaintiff;

(4) that the Plaintiff justifiably relied on Debtor's misrepresentations, omissions, or actions; and

(5) that Plaintiff suffered damages as a result of his justifiable reliance. <u>American Express Travel Related Services</u>

Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996) (elements of section 523(a)(2)(A) claim; burden of proof); Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996) (elements of section 523(a)(2)(A) claim).

Plaintiff contends that Defendants fraudulently misrepresented the extent of Red & White's debts to Defendants' family members and to government agencies in order to secure Plaintiff's investment. Plaintiff further contends that Defendants fraudulently used Sel et Vin's revenues to pay personal expenses. The Court finds, however, that Defendants neither made false representations nor fraudulently omitted information from the disclosures they provided Plaintiff in order to secure his investment in Red & White. The Court further finds that Plaintiff has failed to prove that Defendants fraudulently misappropriated Sel et Vin's funds for personal use.

With respect to Defendants' disclosure of the debts Red & White owed to their families and to government agencies, Defendants' testimony was consistent and credible. They admitted that the estimate of the money borrowed from their families set forth in the SSA was inaccurate, but they emphasized – correctly – that the estimate was exactly that: an estimate, clearly characterized as approximate. And although the SSA afforded Plaintiff the right to request accurate calculations of Red & White's debt, he never did.

Regarding Red & White's debts to government agencies, Defendants testified that such debt consisted of Workers

Compensation premiums, as well as tax debt to the Franchise Tax Board and the State Board of Equalization. While this debt was not estimated in the SSA, Defendants testified that they discussed it with Plaintiff more than once. The Court finds Defendants' testimony on this issue entirely credible.

Defendants also consistently testified that they were as transparent with Plaintiff as possible, and the SSA corroborates this. For example, Defendant Bell testified on cross-examination that he received $105,000 from his brother and an aunt that was not disclosed in the SSA. He also testified, however, that these cash infusions were treated as gifts, which explains why the SSA does not include these amounts in paragraph 6. The Court finds that Defendants did not misrepresent Red & White's debts in the SSA.

Plaintiff also claims that Defendants fraudulently used Sel et Vin's revenues to cover personal expenses including, but not limited to, using them to pay approximately $1,500 in mediation fees arising from the lease-related litigation in which Defendants were involved. In an effort to prove Defendants' use of Sel et Vin's funds for personal expenses, Plaintiff offered the testimony of Brian Hutchinson, an accountant. At Plaintiff's request, Mr. Hutchinson reviewed Red & White's books and records for the purpose of identifying particular entries that established Plaintiff's allegations.

Mr. Hutchinson identified approximately $16,000 in expenses that he believed might not be business expenses. He refused, however, to swear with 100% certainty that these expenses were not business-related. Rather, he stated that,

before reaching any firm conclusion as to the nature of the expenses, he would first need to speak to one or both of the Defendants about each entry, which he admitted he had not done. Accordingly, Mr. Hutchinson's testimony did not prove that Defendants used $16,000 of Sel et Vin's revenues to pay for personal expenses.

Defendants testified that they could not recall the nature of the few particular expenses on which Plaintiff examined them during trial, other than the mediation fees. As to that expense, Defendants candidly admitted it was personal in nature and that use of Sel et Vin's revenues to pay those fees violated the SSA. Defendants also credibly testified, however, that they informed Plaintiff of their intent to use Sel et Vin's funds to pay these mediation fees before they did so and never made any effort to hide or misrepresent what they were doing. They simply did not have personal funds sufficient to pay the mediation fees themselves.

The Court finds that Plaintiff did not prove that Defendants fraudulently misappropriated Sel et Vin's revenues. The true nature of most of the $16,000 in arguably questionable expenses remains unclear. And as to the mediation fees, the Court finds that Defendants neither made false statements nor fraudulently omitted material information concerning their intent to use Sel et Vin's funds to pay that expense. Accordingly, the Court finds in favor of the Defendants on Plaintiff's claim under section 523(a)(2)(A).

Plaintiff also seeks a judgment declaring the amounts he believes Defendants owe to him nondischargeable pursuant to

section 523(a)(4), which excepts from the discharge under section 727 any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In order to prevail on his claim under section 523(a)(4), Plaintiff must establish by a preponderance of the evidence that: (a) an express trust existed; (b) the debt was caused by fraud or defalcation; and (c) the debtor(s) acted as a fiduciary to the creditor at the time the debt was created. Otto v. Niles (In re Niles), 106 F.3d 1456, 1459 (9th Cir. 1997).

Plaintiff contends that, as members and managers of Red & White, Defendants were fiduciaries within the meaning of section 523(a)(4) and that they breached their fiduciary duties by fraudulently misappropriating Sel et Vin's funds.

Plaintiff correctly argues that, under California law, managers of a limited liability company are fiduciaries for purposes of section 523(a)(4). See Ragsdale v. Hallar, 780 F.2d 794, 796-97 (9th Cir. 1986) (recognizing that partners in California partnerships are fiduciaries within the meaning of section 523(a)(4)); Cal. Corp. Code § 17153 (imposing fiduciary obligations of partners in a California partnership on managers of California limited liability companies). Among the fiduciary obligations borne by partners and LLC managers is a duty to account and hold in trust for the LLC or partnership any property, profit, and benefit derived by the partner in the conduct of the entity's business. Cal. Corp. Code § 16404(b)(1).

As applied here, the foregoing authority establishes both the existence of an express trust, the res of which comprised

Sel et Vin's revenues and other assets, and the assumption of fiduciary obligations by the Defendants to account for and manage that res for the LLC's benefit.

As stated in the discussion of Plaintiff's claim under section 523(a)(2)(A), however, Plaintiff has failed to prove that Defendants engaged in fraud or defalcation in their fiduciary capacity. A "defalcation" under section 523(a)(4) requires the "misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds." In re Bigelow, 271 B.R. 178, 186 (B.A.P. 9th Cir. 2001). The existence of a defalcation also requires a culpable state of mind, involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant conduct. Bullock v. BankChampaign, N.A., __ U.S.__, 133 S. Ct. 1754, 1759 (2013). Plaintiff has failed to prove that: (a) Defendants misappropriated trust funds and/or failed to properly account for such funds; and (b) possessed the culpability required for the debt at issue in this proceeding to be nondischargeable under section 523(a)(4).

As indicated above, Plaintiff did not establish that the Defendants misappropriated Sel et Vin's revenues for personal use other than, perhaps, the approximately $1,500 they spent on mediation fees. But even as to that nominal expense, the Court finds that Defendants lacked the gross recklessness required to permit Plaintiff to prevail under section 523(a)(4).

Defendants testified that they informed Plaintiff in advance that they intended to use Sel et Vin's funds to pay the mediation fees because they had no other choice. Desperation

of that sort does not equate to gross recklessness.  Moreover, one of the fundamental tenets of the Bankruptcy Code is the concept of a fresh start for the honest but unfortunate debtor. Marrama v. Citizens Bank of Massachusetts (In re Marrama), 549 U.S. 365, 367 (2007) (quoting Grogan v. Garner, 498 U.S. 278 (1991)). These Debtors deserve a fresh start and this Court shall give them one.  The Court finds in favor of the Defendants on Plaintiff's claim under section 523(a)(4).

**\*\*END OF ORDER\*\***

## Court Service List

[None]